230 F.2d 810
 CITY OF DETROIT, MICHIGAN, a Municipal Corporation, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Panhandle Eastern Pipe Line Company, Intervenor.
COUNTY OF WAYNE, MICHIGAN, a Municipal Corporation and Body Politic, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Panhandle Eastern Pipe Line Company, Intervenor.
 No. 12351.
 No. 12359.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 2, 1955.
 Decided December 15, 1955.
 Petition for Rehearing Denied February 28, 1956.
 
 Mr. Charles S. Rhyne, Washington, D. C., with whom Messrs. James H. Lee, Asst. Corp. Counsel, Public Utilities, City of Detroit, Detroit, Mich., Eugene F. Mullin, Jr., and J. Parker Connor, Washington, D. C., were on the brief, for petitioner in No. 12351.
 Mr. Leonard Simons, Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of Court, with whom Mr. Harry A. Bowen, Washington, D. C., was on the brief, for petitioner in No. 12359.
 Mr. Willard W. Gatchell, General Counsel, Federal Power Commission, and Mr. Jacob Goldberg, Atty., Federal Power Commission, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of Court, with whom Mr. Lambert McAllister, Asst. General Counsel, Federal Power Commission, was on the brief, for respondent in both cases.
 Messrs. William E. Miller and Harry S. Littman, Washington, D. C., for intervenor in both cases. Mr. Raymond N. Shibley, Washington, D. C., also entered an appearance for intervenor in both cases.
 Before FAHY, DANAHER and BASTIAN, Circuit Judges.
 FAHY, Circuit Judge.
 
 
 1
 The City of Detroit, in No. 12351, and the County of Wayne, Michigan, in No. 12359, petition us to review and set aside orders of the Federal Power Commission issued April 15, 1954, and June 7, 1954.[1] Panhandle Eastern Pipe Line Company is an intervenor in both cases. This court consolidated the two cases by an order of October 1, 1954. The Commission's order of April 15, 1954, prescribed, effective May 1, 1954, certain rates and charges for the sale by Panhandle Eastern Pipe Line Company of natural gas in interstate commerce for resale. The order of June 7, 1954, denied a rehearing. The Commission found the rates and charges prescribed to be "just and reasonable" within the meaning of section 4(a) of the Natural Gas Act, 52 Stat. 822 (1938), 15 U.S.C.A. §§ 717 et seq., 717c(a). Panhandle is a "natural-gas company", that is, it is engaged in the transportation of natural gas in interstate commerce and in its sale in such commerce for resale. Its rates and charges accordingly are within the jurisdiction of the Commission, and of this court on review of the Commission's order. See note 1 supra, and section 2 (6) of the Natural Gas Act, 52 Stat. 822 (1938), 15 U.S.C.A. § 717a(6).
 
 
 2
 The Commission determined the rates and charges in the following circumstances: Pursuant to section 5(a) of the Act it ordered an investigation of Panhandle's rates. Pursuant to section 4 Panhandle subsequently filed a revised tariff proposing increased rates aggregating approximately $21,400,000. The Commission suspended this proposed increase, but later permitted it to become effective as of February 20, 1952, under a bond furnished in compliance with section 4(e). Upon conclusion of hearings on the tariff and related matters the Commission on April 15, 1954 issued its order now under review. It prescribed rates which permit an increase, effective May 1, 1954, of approximately $12,780,000 instead of the $21,400,000 sought by Panhandle. The order also directed that the record be reopened for the limited purpose of introducing evidence on the basis of which the Commission could calculate the precise amount collected by Panhandle under bond since February 20, 1952, in excess of the sum found by the Commission to be "just and reasonable." The order indicated that this sum, when determined, will have to be refunded by Panhandle with 6 per cent interest.
 
 
 3
 Panhandle owns and operates a natural gas pipeline through which it transports gas from Texas, Oklahoma, and Kansas to Michigan and intervening states. It purchases gas in the field and from other sources, including its own subsidiary, the Trunkline Gas Supply Company, and it also produces gas in the Panhandle-Hugoton gas fields in Texas, Oklahoma and Kansas. For the year 1952, the test year used by the Commission, 22.6 per cent of its total gas supply came from its own production; 25.3 per cent was purchased from Trunkline, its subsidiary; and the balance, 52.1 per cent, was purchased from others. The jurisdictional sales, that is, sales in interstate commerce for resale, amounted to 275,052,339 Mcf out of a total sales volume of 327,530,405 Mcf. Panhandle's own production, or 22.6 per cent of its total supply, amounted during the test year to 73,204,677 Mcf.
 
 
 4
 Both petitioners assert that the Commission erred (1) in allowing Panhandle the so-called "field price" or "commodity value" for its own produced gas; (2) in not considering profits from Panhandle's gasoline extraction operations when computing the revenues to be recovered by the rates; (3) in denying petitioners' motions to reopen the hearing in order to consider newly discovered evidence. In addition, petitioner City of Detroit urges (4) that the Commission erred in its treatment of accelerated amortization.[2]
 
 
 5
 We first consider whether the rates approved are "just and reasonable"[3] notwithstanding the Commission used the "field price" method with respect to Panhandle's own produced gas. In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the Supreme Court approved use of the "prudent investment" rate-base method for establishing rates to be charged by natural gas companies. Since then, until the instant case, the Commission has consistently employed this rate-base method, under which rates are considered "just and reasonable" if they will return to the company a certain percentage of profit on its rate base. The rate base is a figure representing the money prudently invested in the properties and equipment utilized in the company's transmission and production business. The percentage of profit prescribed by the Commission depends upon a variety of factors, such as the risks of the business, the necessity for attracting capital, and the desirability of lower cost of gas to the public. In order to return a profit on the rate base the rates are set high enough to recover all costs of service, including taxes, depreciation, depletion, and all operating expenses chargeable to production and transmission.
 
 
 6
 In the instant case the Commission substantially modified this traditional rate-base approach by using a different formula for Panhandle's own producing properties. It computed a "field price" for the gas obtained from this source, based upon the "weighted average arm's length prices" established by federally unregulated bargaining for similar gas in the fields.[4] It then multiplied the volume of Panhandle's production by that "field price" and included the result in Panhandle's operating expenses as an amount to be recovered through the rates.[5] At the same time the Commission excluded from the rate base the cost of the properties which produce this gas and excluded from recoverable operating expenses the cost of producing it. The Commission states that its purpose is to allow Panhandle to receive for its own produced gas "a price reflecting the weighted average arm's-length payments for identical natural gas in the fields (and sometimes from the very same wells) where it is produced," instead of a return on its legitimate investment in the properties and equipment used in producing this gas. The Commission points out that the price or value allowed is below the rates of royalties which Panhandle was currently paying on its own production to its lessors, below the prices at which more recent gas purchase contracts have been negotiated in the Hugoton field in Texas and Kansas, and also below the reported recent range of prices in the Panhandle field of Texas and in the Gulf Coast area. It terms the amount allowed "a conservative measure of the commodity value of the gas which Panhandle produces." The Commission specifies certain adjustments which bring to $3,571,448 the total difference, applicable to jurisdictional sales, between the amount allowed by the method it adopted and that which would have been allowed by entire use of the traditional rate-base method. This amounts to an overall increase of 1.3 cents per Mcf.
 
 
 7
 The Commission fixed a rate base of $148,609,012 for Panhandle's other properties. The accuracy of this amount is uncontested. And the 5.75 per cent rate of return fixed by the Commission on this rate base is also uncontested.[6] Furthermore, we accept as supported by substantial evidence the findings of the Commission regarding the weighted average arm's length prices paid at the wellhead. In the end, therefore, the question is whether the larger amount required to be paid by consumers, $3,571,448 as found by the Commission,[7] than would be charged were the rate-base method followed throughout, removes the prescribed rates from a "just and reasonable" category. If so, they are unlawful under section 4(a).
 
 
 8
 Petitioners would have us answer this question affirmatively on the ground that only a traditional rate-base method can lead to "just and reasonable" rates, or, in any event, on the ground that the field price method cannot do so. We think this position is not supported by either the statute or the decisions of the Supreme Court. It is true that in Federal Power Commission v. Hope Natural Gas Co., supra, the Court spoke in a context which might be thought to presuppose the use of some rate-base method, with latitude only within the limitations of such a method. Thus, petitioners cite the portion of the Hope opinion where the Court, in denying the Commission power to set rates so as to discourage industrial use of gas and encourage its domestic use, said that section 4(a) and section 5(a) "contain only the conventional standards of rate-making for natural gas companies." 320 U.S. at page 616, 64 S.Ct. at page 294. But we think this statement, considered in light of the decision made and the specific problem to which the Court was addressing itself, does not mean that use of the field price is necessarily prohibited and that the rate-base method is mandatory for all properties in all circumstances. The holding in the case is inconsistent with such a meaning, for the Court declined even to consider an alleged error in the method used, saying,
 
 
 9
 "* * * it is the result reached not the method employed which is controlling. * * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. * * * and he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." 320 U.S. at page 602, 64 S.Ct. at page 287.
 
 
 10
 Petitioners refer to a footnote in the Hope opinion where it is said that section 6 in its reference to "`actual legitimate cost'" and "original cost" "comes the closest to supplying any definite criteria for rate making." 320 U.S. at page 601 note 8, 64 S.Ct. at page 287. But the implication is that the Court does not feel that section 6 completely restricts the Commission to consideration of factors related to costs. Moreover, other statements in the Hope decision are adverse to petitioners' contention. At one point the Court said that Congress,
 
 
 11
 "* * * has provided no formula by which the `just and reasonable' rate is to be determined. It has not filled in the details of the general prescription of § 4(a) and § 5(a). It has not expressed in a specific rule the fixed principle of `just and reasonable.'" 320 U.S. at pages 600-601, 64 S.Ct. at page 287.
 
 
 12
 In the later case of Colorado Interstate Gas. Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206, when the general subject was again thoroughly reviewed, the Court, in holding that the Commission was not required to exclude gathering facilities from the rate base and allow "the fair field price of the gas as a commodity" in operating expenses, added, "We do not say that the Commission lacks the authority to depart from the rate-base method. We only hold that the Commission is not precluded from using it. * * *" 324 U. S. at page 601, 65 S.Ct. at page 839. See, also, Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, 1049-1050.
 
 
 13
 Thus the wording of section 4(a) in broad terms of "just and reasonable" rates, and the construction given the statute in the Hope, Colorado Interstate, and Natural Gas cases, convince us that the allowance of a field price for the utility's own produced gas as an element in the ultimate composition of rates is not unlawful merely because it departs from the traditional rate-base method. But, of course, such an innovation must not lift the rates above the "just and reasonable" standards of the statute.[8]
 
 
 14
 Petitioners also contend that the formula used results in rates which are note the lowest reasonable rates, and hence they are unlawful under section 5 (a), which provides that the Commission "may order a decrease where existing rates * * * are not the lowest reasonable rates." True it is that the rates would be lower were the rate-base method used throughout; and it is equally true that such rates may be "just and reasonable." But we think section 5(a) does not mean that rates which are not the lowest reasonable rates cannot also be "just and reasonable" under section 4(a). Rather, it means that a decrease ordered by the Commission which leaves the utility with rates which are non-confiscatory will not be held invalid; that is, section 5(a) permits but does not compel the Commission to go to the very limit of constitutional power. See Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. at pages 585-586, 62 S.Ct. at pages 742-743. If Congress had intended "lowest reasonable" to be the uniform criterion it would not have relegated that standard to a proviso in section 5(a), but instead would have incorporated it in section 4(a). Moreover, it cannot be said that petitioners' interpretation of section 5(a) is required by reason, in view of the obvious practical difficulties which would result from forcing the Commission always to set rates at the very brink of confiscation.
 
 
 15
 Although the Commission cannot be compelled to fix rates at the lowest level of reasonableness, nevertheless it remains true that the primary aim of the Act, in the words of the Supreme Court, is "to protect consumers against exploitation at the hands of natural gas companies." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at page 610, 64 S.Ct. at page 291. See, also, Id., 320 U.S. at page 612, 64 S.Ct. at page 292; Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 685, 74 S.Ct. 794, 800-801, 98 L.Ed. 1035, 1049. With this in mind we continue our inquiry whether the rates under review conform with the standards of section 4(a).
 
 
 16
 The fair field price, which as we have seen results in higher rates than would have resulted from the traditional rate-base method, is not an item of cost. Its inclusion as an amount to be recouped from consumers as though it were a cost incurred by Panhandle must find some other justification within the periphery of the "just and reasonable" standards. It is not an ingredient of any of the usual needs of a regulated utility, that is, to obtain revenues for operating expenses, for preservation of its financial integrity, for capital costs, for servicing of debt and payment of dividends, or for delayed rentals or costs of exploration and development. See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at pages 605, 615, 64 S.Ct. at pages 289, 294. The Commission, however, advances other factors of an economic character as justification. We may not deny these a place in the total structure underlying rates if, in a balancing of investor and consumer interests, they are brought by evidence and findings into rational relationship to what is "just and reasonable." See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at pages 603, 615, 64 S.Ct. at pages 288, 294. And in considering whether the two interests are properly balanced we must keep in mind the basic purpose of the statute to protect consumers from excessive rates, though at the same time the statute affords the support of public authority to the regulated utility.
 
 
 17
 The Commission expresses the basic problem in these words:
 
 
 18
 "* * * The question here presented is what method of pricing pipeline-produced gas will, under present-day realities and in the light of the facts of record in this case, best serve the ultimate public interest. * * *"
 
 
 19
 In resolving this question in favor of the use it made of the field price the Commission states that the traditional rate-base system (1) tends unduly to accelerate consumption of gas, (2) does not sufficiently encourage its discovery and development, thus failing to promote the national interest in both the production and use of natural gas, and finally, (3) that the interest of the public definitely lies in the direction of natural gas production by pipeline systems themselves as distinguished from their complete dependence for gas upon purchases from other producers.[9]
 
 
 20
 The Supreme Court pointed out in the Hope case that the Commission was faced with the problem of determining the amount which a private operator should be allowed to earn from the sale of natural gas across state lines through an established distribution system. "Secs. 4 and 5, not § 7, provide the standards for that determination." 320 U.S. at page 612, 64 S.Ct. at page 292. There West Virginia claimed the Commission should have considered whether the establishment of low rates would not "hasten the abandonment of low-yield high-cost marginal wells." See 320 U.S. at pages 608-614, 64 S.Ct. at pages 290-293. In holding that the Commission could not base its order on such "considerations of conservation", the court pointed out that "the Act does not intrude on the domain traditionally reserved for control by state commissions; and the Federal Power Commission was given no authority over `the production or gathering of natural gas.' § 1(b)." 320 U.S. at pages 612-613, 64 S.Ct. at page 292. On this record we believe the problem of accelerated usage is like those "considerations of conservation" with which the Commission has not been empowered to deal except in problems arising under sections 7 and 11.[10]
 
 
 21
 As to the remaining two grounds advanced by the Commission, we think they are within the scope of the Act. The first is the need for encouraging exploration and development of gas resources. The Hope opinion indicates that the Commission may consider this factor, at least to the extent of allowing recovery of development and exploration costs. Whether the Commission can go further, as it did in the instant case, we need not decide, at least not on the present record, since, as will appear, we base our decision on this point upon a different reason than lack of power in the Commission. The final ground, the one the Commission appears chiefly to rely upon, is that ownership by pipeline companies of their own producing facilities, instead of their complete dependence for gas supply on purchases from other producers, would serve the public interest by ultimately resulting in lower rates. This would come about, the Commission states, because producing companies would have greater bargaining power when contracting for gas purchases, and would also be able to use their own gas in such a manner that the gas from other companies could be obtained at a relatively uniform rate, thereby enabling the pipeline companies to acquire such gas at a lower price because of certain clauses in the typical gas purchase contracts. The Commission adds a further public interest factor, that consumers remote from production sources would be assured of adequate continuous supply.
 
 
 22
 While as we have indicated the Commission may be empowered to consider some of these factors it must also, and always, relate its action to the primary aim of the Act to guard the consumer against excessive rates. If the Commission contemplates increasing rates for the purpose of encouraging exploration and development, or the ownership by pipeline companies of their own producing facilities, it must see to it that the increase is in fact needed, and is no more than is needed, for the purpose. Further than this we think the Commission cannot go without additional authority from Congress.
 
 
 23
 The amount allowed Panhandle for the encouragement referred to is not shown to meet this test by any evidence and findings. Of course the rate increase attributable to producing properties might have a tendency to encourage their ownership, and perhaps also the development of new sources of production, as an even greater increase also might do.[11] But the question is whether a lesser amount would suffice.[12] The amount here allowed is not brought into relationship by the evidence and findings with the purposes for which it is granted except that it affords a larger revenue to Panhandle than otherwise it would have. This is not an adequate basis for bringing the resulting rates within the "just and reasonable" standards of the Act. The mere fact that the field price method is used does not vindicate the rates. Its use can be justified only in terms of a demonstrated public interest.[13] In this case an allowance for the desired purposes, assuming they are valid, could be included without resort to the field price system. When the latter method is used the evidence and findings must show that the increase in rates thus caused is no more than is reasonably necessary for the purposes advanced for any increase. Since there is nothing in these proceedings from which such a conclusion could be drawn, they are fatally defective.[14] In other words, we do not substitute "our opinions for the expert judgment of the administrators to whom Congress entrusted the decision." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at page 615, 64 S.Ct. at page 294. We simply say that if the Commission is now to abandon the treatment historically accorded pipeline-produced gas in rate making on the ground that the ultimate public interest will be better served thereby, the Commission should justify it on the record.
 
 
 24
 An additional explanation of our view is desirable. We should not be understood to say that whenever the Commission does establish the necessary relationship between means and end, a prescribed rate increase will be lawful. In view of the primary orientation of the Act toward the maintenance of low prices for the consumer, we do not preclude the possibility that a rate increase might be unlawful even though no lower rate could encourage gas production by pipeline companies. On this record, however, if the necessary relationship had been shown we would not consider the rates so high as to be unlawful.
 
 
 25
 Furthermore, it is seen that when we refer to an "increase" we mean an increase in the rates above those which would result from use of the conventional rate-base method. For, though we hold that method not to be the only one available under the statute, it is essential in such a case as this that it be used as a basis of comparison. It has been repeatedly used by the Commission, and repeatedly approved by the courts, as a means of arriving at lawful — "just and reasonable" — rates under the Act. Unless it is continued to be used at least as a point of departure, the whole experience under the Act is discarded and no anchor, as it were, is available by which to hold the terms "just and reasonable" to some recognizable meaning.
 
 
 26
 It may be thought that our reference to the rate-base method, as well as our holding that the Commission's use of the field price is invalid because not properly related to the public interest by the evidence and findings, is inconsistent with the "end result" test employed by the Supreme Court in the Hope case. We think not. That test was applied in assessing the reasonableness of rates from the company's point of view. See 320 U.S. at page 603, 64 S.Ct. at page 288. The factors comprising the test were enumerated by the Court — successful business operation, maintenance of financial integrity, attraction of necessary capital, and compensation of investors for risks assumed. See 320 U.S. at page 605, 64 S.Ct. at page 289. From the consumer standpoint no such criteria are available.
 
 
 27
 On this branch of the case we will set aside the order of the Commission, but will remand the case to enable the Commission, if it so desires, to seek to supplement the record and findings consistently with the views hereinabove expressed. In such proceedings, the Commission should also consider the impact of Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L. Ed. 1035, upon its stated reasons for desiring to encourage pipeline companies to produce their own gas. In Phillips, decided subsequently to the Commission's order in the instant case, the Supreme Court held that the Federal Power Commission has jurisdiction "over the rates of all wholesales of natural gas in interstate commerce whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." 347 U. S. at page 682, 74 S.Ct. at page 799. The effect of the decision will probably be to subject to federal regulation the prices paid by pipeline companies for most of the gas they purchase. Consequently, the question of indirectly influencing these prices by the means here chosen by the Commission, such as augmenting the bargaining power of the pipeline company, may be considerably affected.
 
 
 28
 There is one other respect in which we are unable to agree with the Commission. It found that Panhandle turns over to Phillips Petroleum Company at the latter's Sneed gasoline extraction plant certain volumes of gas which Panhandle purchases and produces in the Panhandle field. Phillips extracts the gasoline and returns the residue gas to Panhandle for transmission and sale. Panhandle's estimated net revenue from this operation in the test year 1952 was found to be $667,348. Panhandle also owns and operates the Liberal Gasoline Plant in Kansas, at which another portion of its purchased and produced gas is processed and the extracted gasoline and other hydrocarbons sold under contract to the Shamrock Oil and Gas Company. The estimated net revenues from this operation in the test year 1952 were $1,315,577. Prior to its present decision, the Commission had in numerous cases credited such revenues to the operating expenses to be recovered in the rates. See, e. g., In the Matter of Hope Natural Gas Company, 3 F.P.C. 150, 178; In the Matter of Cities Service Gas Company, 3 F.P.C. 459, 480-481; City of Columbus v. United Fuel Gas Company, 5 F.P.C. 279, 290. The Commission's action in the first two of these cases received appellate court sanction. See Hope Natural Gas Co. v. Federal Power Commission, 4 Cir., 134 F.2d 287, 307-308, reversed on other grounds, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 155 F.2d 694, 703, certiorari denied 329 U.S. 773, 67 S.Ct. 191, 91 L. Ed. 664. The only justification for not following a similar practice in this case, in the words of the Commission, is "the rates which we prescribe for the sale of natural gas for resale should not rest in part upon the fluctuating and unregulated prices of natural gasoline and other liquid hydrocarbons." To this statement is appended a footnote reading, "The market prices of gasoline have varied over the years from less than 2¢ to a high of 8¢ per gallon — the estimated price for the test year 1952 being 6.4¢ per gallon for natural gasoline and 3.04¢ per gallon for liquefied petroleum gas."
 
 
 29
 The Commission feels free to disregard its prior decisions because it concludes that the treatment there given this problem was "bottomed on findings that the processing was `necessary to make the natural gas marketable and transportable,'" or "was `* * * an essential part of the business of transporting and marketing the natural gas.'"[15] The Commission says that the evidence before it would not support a similar finding with respect to Panhandle's extraction operations. Therefore the Commission concludes that Panhandle's extraction operations should be "treated as non-jurisdictional." It appears the Commission did not mean to say that there was a jurisdictional bar to crediting the extraction revenues to operating costs, but rather intended to treat the extraction phase of Panhandle's business as non-jurisdictional in order to implement its policy of eliminating fluctuations in rates. The Commission stated:
 
 
 30
 "* * * We do not rest our decision * * * upon the question of jurisdiction, for the record clearly shows that certain of the facilities of Panhandle with respect to which we have unquestioned jurisdiction are jointly used by the gasoline business and in the business of transporting and selling natural gas in interstate commerce for resale. Likewise, expenses are jointly incurred in the purchase, production, gathering, and transportation of the raw natural gas from the wellmouth or points of purchase to the gasoline plants."
 
 
 31
 The Commission also found that though the extraction process was not necessary to Panhandle's pipeline operations, it was desirable:
 
 
 32
 "* * * While we believe the evidence shows it to be a fact that Panhandle would be able to discontinue the extraction of gasoline without incurring serious operating difficulties, nevertheless it is also true that the reduction in the liquid content of the gas through the extraction of the heavier hydrocarbons does improve the operating efficiency of Panhandle's pipeline system."
 
 
 33
 These facts regarding the usefulness of the extraction process to the transmission operations, the joint use of facilities, and the joint incurring of expenses, coupled with the obvious fact that the extraction process is incident to the overall pipeline transmission and resale operations, clearly bring the extraction operations within the jurisdiction of the Commission.
 
 
 34
 We believe the fact that crediting extraction revenues to operating expenses may cause some unspecified and apparently slight effect on rates because of fluctuation in the price of gasoline is not a valid basis for refusing to credit the extraction revenues of Panhandle to operating costs or costs of service. Most of the costs which must be recovered through the rate, such as labor and equipment expenses, are subject to frequent changes, but the Commission has been able to adjust rates satisfactorily. Moreover, it may be noted that were the field price used as the Commission proposes, it would undoubtedly vary from time to time. The similar problem of fluctuation in gasoline prices would not seem to impose a sufficiently heavy additional burden upon the Commission to justify depriving the consumer of a substantial credit, approximating $2,000,000 in this case, upon the costs to be recouped through the rates.
 
 
 35
 Since the reason given by the Commission for the failure to give credit for these revenues is unacceptable to the court, and the Commission has failed to demonstrate a basis for its conclusion that the extraction business should be treated as non-jurisdictional "to the extent that such extraction is not requisite to preparation of the gas for pipe-line transportation," as it said, credit for these revenues should be given. If there were any danger that these desirable extraction operations would be discontinued unless the profits inured solely to the benefit of the stockholders, a different question might be presented. But the history of the problem in this and other cases does not give basis for such a supposition.
 
 
 36
 We do not disturb the Commission's solution of the problem created by federal income tax savings resulting from accelerated amortization. Such amortization is permitted under certificates of necessity, applicable to emergency facilities, issued pursuant to section 124A of the Internal Revenue Code, 26 U.S.C. § 124A (1952),[16] to encourage construction in the interest of national defense. Panhandle has had an aggregate investment of $10,563,609 certified for accelerated amortization. Under section 124A Panhandle is authorized to charge off this total amount to depreciation in five years, regardless of the estimated useful life of the properties, thus accelerating the amortization of these facilities. The Commission points out that the savings in federal income taxes thus effected for each of the five years will be
 
 
 37
 "* * * the difference between what taxes it [Panhandle] would otherwise have been required to pay without accelerated amortization and the taxes actually paid."
 
 
 38
 The Commission continues,
 
 
 39
 "* * * We have computed the tax payments which would have been required without the accelerated amortization which Panhandle is permitted, and for the purposes of the rate schedules under study have considered that Panhandle will be allowed as operating expenses such normalized taxes. This does not allow Panhandle for rate purposes more than a fair return over the long period, but does recognize the grant by Congress of certain temporary tax savings under Section 124A."
 
 
 40
 Since, however, Congress intended by section 124A only to defer tax liability, and not to provide a fund which could be diverted by Panhandle to the payment of dividends, the Commission further states, "the accruals for taxes in excess of those actually paid should logically be treated by Panhandle, not as free and unrestricted income, but earmarked to provide for the future meeting of such liability." After the facilities have been fully depreciated under the accelerated amortization plan, income taxes will normally be greater, since no further deductions for depreciation will be possible. By setting up a special reserve for the tax saving of the first five years, the Commission insures that this amount will go to meet the increased taxes after that period, rather than being paid out in dividends.
 
 
 41
 Petitioners object to the Commission's method of "normalizing" income tax expense, by which all computations are made as if amortization were not accelerated. They contend that in order to hold rates to a "just and reasonable" level, the savings effected by the accelerated amortization should partly inure to the benefit of consumers. They propose that this be accomplished by treating the saving simply as ordinary depreciation would be treated. That is, in computing recoverable expenses, the income tax expense would be figured at its actual, instead of "normalized," amount, but depreciation expense would be set at the accelerated figure. Thus the same saving would accrue to Panhandle, but under the name of depreciation expense rather than income tax expense. The difference, however, would lie in this, that amounts recovered as depreciation expense are deducted from the rate base. Thus in essence petitioners' plan would allow Panhandle its yearly saving for the five year period, but would deduct the amount of that saving each year from the rate base.
 
 
 42
 This plan was rejected by the Commission, which concluded, we think correctly, that the intent of Congress reflected in section 124A is not to benefit consumers but rather the taxpayer in order to encourage construction of certain emergency types of facilities. Were the tax savings deducted from the rate base, the taxpayer here would not receive the intended benefit. The valuations upon which it is entitled to earn a fair rate of return would be decreased by the amount of the savings. In placing the savings at the disposal of Panhandle under the limitations specified, the Congressional intent is effectuated. The funds go into a reserve account for the payment of the deferred taxes to accrue after the five year amortization period. Though thus earmarked, the funds are available for income-producing purposes. Unless this is permitted, it is difficult to see how Panhandle could benefit substantially from section 124A.[17] This statute, unlike the Natural Gas Act itself, is not for consumer benefit. It has a different public policy and should be given effect as intended by Congress. Furthermore, the solution of the Commission does not result in higher rates to the consumer. It simply does not operate to reduce them. It aids Panhandle but neither aids nor harms petitioners. We think this is the result sought by Congress.
 
 
 43
 Finally, we agree with the Commission that it was not required to reopen the proceedings. Petitioners sought such reopening to permit proof of increased sales volume. Evidence of such increase was offered in the effort to show that the unit cost of service would be reduced. The parties agree, however, that 1952 was a proper test year, and the Commission made its calculations on the basis of evidence available as to that year. We find no abuse of discretion in the Commission's refusal to reopen for evidence subsequently available, especially as there is no clear indication that the evidence offered, considered with all factors involved, would likely lead to a different result. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514-515, 64 S.Ct. 1129, 1134-1135, 88 L. Ed. 1420, 1428.
 
 
 44
 Because of our view that allowance of the fair field value of Panhandle's own produced gas as an operating expense is not here supported by the evidence and findings to be in the public interest, and because of our disagreement with respect to the Commission's failure to credit the revenues of the gasoline extraction operations, the order under review is
 
 
 45
 Set aside and the cases are remanded to the Commission for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The review petitions are filed in this court under § 19(b) of the Natural Gas Act, 52 Stat. 831 (1938), 15 U.S.C.A. § 717r(b)
 
 
 [2]
 Commissioner Draper dissented from the Commission's use of the "field price" formula, the exclusion of the profits of the gasoline extraction plants, and the denial of the motions to reopen; and Commissioner Doty dissented from the Commission's treatment of the amortization question
 
 
 [3]
 "All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." Natural Gas Act § 4(a), 52 Stat. 822 (1938), 15 U.S.C.A. § 717c(a)
 
 
 [4]
 The prices found were 7 cents per Mcf in the Panhandle field in Texas, 9.4978 cents in the Hugoton field in Kansas, and 11 cents in the Hugoton field in Oklahoma
 
 
 [5]
 The total amount allowed for this gas was $5,476,804
 
 
 [6]
 Were the rate-base method applied to Panhandle's own producing properties in the case at hand, the Commission, vigorously disputed by petitioners, says that according to Panhandle's contention, "and its evidence is not contradicted by any facts on this record," the investors would be allowed "less than nothing at the well-head for each Mcf of the natural gas which it [Panhandle] produces in the Southwest. At the well-head the staff shows total Cost of Service of $3,399,165, Operating Expenses of $1,957,817, Depreciation, Depletion and Amortization totaling $548,263, and Taxes of $269,799, or total Operating Revenue Deductions of $2,775,879, and a return of $623,286, or .85 cents per Mcf. With the elimination of the tax benefit on account of the depletion allowance, amounting to $537,524, deleted by the staff, however, the net return is reduced to $85,762, or .12 cents per Mcf. And, with the further deduction of $993,306 for Extraction or Production Credits proposed by the staff, this figure is converted into a deficit of $907,544, orminus 1.24 cents per Mcf. Thus, on this basis it might be said that, rather than earning a fair return on its production properties, Panhandle would incur a penalty for owning and operating them. This penalty would tend to increase with the passage of time as its reserves for depreciation and depletion are built up or if its net revenues from the extraction of hydrocarbons should rise."
 
 
 [7]
 This statement of the different results of the two methods, however, should be qualified insofar as it is said to reflect the findings of the Commission itself; for the Commission also said that if the comparison were strictly limited to the results of these methods without the further adjustment made in this case for accelerated amortization, the difference would be decreased by more than half, from a rate differential of 1.3 cents per Mcf to one of 0.6 cents per Mcf
 
 
 [8]
 These standards, in turn, are within those of the Constitution. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. at page 586, 62 S.Ct. at page 743
 
 
 [9]
 In addition to these reasons, the Commission discussed the "economic incongruity" resulting from use of the traditional rate-base system, whereby Panhandle would receive a different amount of money for the gas it produces than other producers receive for gas in some instances coming from the same well and going to the same consumers. In his dissent in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at page 628, 64 S.Ct. at page 300, and in his concurring opinion in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 608 65 S.Ct. 829, 89 L.Ed. 1206, Mr. Justice Jackson dwelt at some length on the "delirious" and "capricious" results of using the rate-base method for natural gas pricing. The Commission quoted extensively from these opinions to bolster its position. Both Commissioner Draper and petitioners contend that adoption of the field price system in the instant case did not correct the evils discussed by Mr. Justice Jackson. Whether or not this be true, and whatever the theoretical merits of the Commission's argument, it cannot provide a basis for setting rates under the Act. The only factors which may move the Commission are those related to the public interest. Symmetry of prices per se has no such relation. The Commission tacitly conceded this when it stated: "Apart from the economic incongruity of such a price situation, there is the fundamental and paramount question, whether such result would be in the public interest. * * *"
 
 
 [10]
 The Court in Hope pointed out that § 7 may give the Commission authority to consider certain aspects of conservation when deciding whether facilities or services should be abandoned or extended. 320 U.S. at page 612, 64 S.Ct. at page 292. But the Court concluded that no § 7 issue was involved in Hope, and we believe it to be clear that none is present here. Conservation may also become the concern of the Commission under § 11, which directs the Commission to aid states which propose to Congress interstate compacts dealing with the conservation, transportation, production, or distribution of natural gas
 
 
 [11]
 The findings afford no reasonable basis, however, for believing that the increase in rates, amounting to only 1.3 cents per Mcf on Panhandle's total sales, would cause any appreciable reduction in gas consumption
 
 
 [12]
 Commissioner Draper points to several recent cases in which the field price method was not used, e. g., In the Matter of United Fuel Company, Opinion No. 258, August 7, 1953, and inquires whether the Commission practice will be to allow the field price only if the pipeline company requests it. It should be noted that the cases cited by Commissioner Draper were decided before the instant case. If the Commission were uniformly to apply the field price system, all risks of exploration and development would be placed upon the pipeline companies. On the other hand, if the Commission gives the companies their option, the traditional rate-base system would naturally be chosen whenever costs of production exceed the field price. In that event, no risks of exploration, development, or production would fall upon the companies, and it would appear that a small margin of profit should suffice to encourage such activities. It is doubtful that the same margin of profit would be required as might be received by producers who bear their own risks. Yet the field price system would seem to have the effect of putting pipeline companies on a par with such producers
 
 
 [13]
 See note 9 supra
 
 
 [14]
 As to the necessity of evidence and findings to enable review consistently with statutory authority, see Capital Transit Co. v. Public Utilities Commission, 93 U.S.App.D.C. 194, 200-202, 213 F.2d 176, 182-184, certiorari denied 348 U.S. 816, 75 S.Ct. 25, and cases cited
 
 
 [15]
 There is some doubt as to whether the Commission is correct in its interpretation of these prior cases. Its finding in In the Matter of Cities Service Gas Company, 3 F.P.C. 459, 480-481, was phrased in these words: "This operation is profitable and renders the natural gas more readily marketable and transportable. The extraction of gasoline and other residuals reduces the heat content and consumes a certain volume of the natural gas. Accordingly, the gas consumers are entitled to a fair proportion of the net earnings derived from the processing operations." Thus the Commission found, not that extraction was absolutely necessary for transporting and marketing the gas, but that it was quite helpful. It is true that in affirming, the appellate court referred to the extraction process as an "essential part of the business of transporting and marketing the natural gas * * *," Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 155 F.2d 694, 703, but this was not the language of the Commission
 
 
 [16]
 Now § 168 of the Internal Revenue Code of 1954, 26 U.S.C
 
 
 [17]
 Petitioner City of Detroit and Commissioner Doty contended that Panhandle would benefit by being able to write off the property in a short period of time. But even if that be considered an advantage, the question is whether it alone would fulfill Congressional intent. Panhandle points out that if it had to deduct the tax saving from the rate base, it would probably lose in the long run. The two primary uses for the saving would be reinvestment, by virtue of which the money would again go into the rate base, and retirement of debt. Panhandle argues forcefully that if it used the tax saving to retire debt, it would save only the interest on its debt, while giving up 5.75% return on that same amount. Thus Panhandle would suffer a net loss, since the interest cost of debt is generally less than 5.75%. On the other hand, if the tax saving were used to reinvest in plant, there would also probably be a net loss because there would inevitably be a lag between the time the money becomes available and the time it is added to the rate base. Thus it seems clear that if rapid writing off of investment be an advantage which would accrue to Panhandle under petitioners' proposal, it might be too easily offset by disadvantages for us to conclude that it was the sole benefit to investors contemplated by Congress. This conviction is reinforced, of course, by the fact that there is no indication of a Congressional intent to benefit consumers