CITY OF PITTSBURGH, Chotin Towing Corporation, and Greenville Towing Company, Inc., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Texas Eastern Transmission Corporation, Intervenor.

No. 12895.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 9, 1955.

Decided March 8, 1956.

with whom Mr. Bryce Rea, Jr., Washington, D. C., was on the brief, for petitioners.

Mr. William J. Grove, Asst. Gen. Counsel, Federal Power Commission, with whom Mr. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, was on the brief, for respondent.

Messrs. R. Clyde Hargrove, of the bar of the Supreme Court of Louisiana, Shreveport, La., pro hac vice, by special leave of Court, and Charles I. Thompson, Philadelphia, Pa., for intervenor.

Mr. Martin L. Friedman, Washington, D. C., also entered an appearance for intervenor.

Before EDGERTON, Chief Judge, and BAZELON and BASTIAN, Circuit Judges.

BAZELON, Circuit Judge.

This is a petition to review and set aside an order of the Federal Power Commission under § 7 of the Natural Gas Act[1] granting the application of Texas Eastern Transmission Corporation for a certificate of public convenience and necessity. The certificate authorized abandonment of the Little Inch pipeline between Baytown, Texas, and Moundsville, West Virginia, as a natural gas pipeline. As a substitute, the certificate authorized construction of (1) a tie-line connecting the Baytown area to the Company's Kosciusko line at Kosciusko, Mississippi, and (2) additional compression facilities on the Kosciusko line from Kosciusko to Connelsville, Pennsylvania. The petitioners seeking review of the order are (1) Chotin Towing Corporation and Greenville Towing Company, Inc., operators of barges carrying petroleum products on the Mississippi and Ohio River systems, and (2) the City of Pittsburgh, Pennsylvania. They were parties to the proceedings before the Commission, having intervened by leave of the Commission. Texas Eastern, the certificate holder, has intervened in this court.

Messrs. Robert Engel, of the bar of the Supreme Court of Pennsylvania, Pittsburgh, Pa., pro hac vice, by special leave of Court, and Harold Leventhal,

I. 15 U.S.C.A. § 717f.

The Commission and Texas Eastern have moved to dismiss the petition for review on the ground that the petitioners are not "aggrieved" by the order within the meaning of § 19(b) of the Act.[2]

### The Barge Operators' Standing.

▮ "The basic and motivating reason underlying Texas Eastern's application," as found by the Commission, is to make the Little Inch pipeline available for petroleum products. The barge operators allege that Texas Eastern competes with them in supplying fuels to eastern markets and that the Commission's order will increase that competition by adding petroleum products to natural gas as the source of the competition. This would seem to give standing under the principle of National Coal Ass'n v. Federal Power Comm.[3] The Commission and Texas Eastern argue that National Coal is inapplicable because (1) impact of the Little Inch conversion upon the petroleum products transportation industry is not a factor which the Natural Gas Act authorizes the Commission to consider in determining whether abandonment of a *gas pipeline* serves the public convenience and necessity; (2) the barge operators' aggrievement is not by order of the Commission and, in any event, not direct and immediate; (3) this case is controlled by Singer & Sons v. Union Pacific R. R.;[4] and (4) even if the barge operators have alleged sufficient injury, they have failed to prove it and so were correctly found by the Commission not to be aggrieved by the order. We think these arguments must fail.

▮ (1) In National Coal we held that, since natural gas and coal are competitive fuels, an association of coal mine operators, some of whom sold to the same market as a projected natural gas service, were "aggrieved" by an order authorizing gas service and entitled to review of the order. We recognized a similar right of review in a union whose members included employees of those coal mines and a union whose members included employees of the railroads delivering fuels to the market in question. We did not imply that the Federal Power Commission was authorized to deny a certificate of public convenience and necessity for a natural gas pipeline merely because of the adverse effect upon producers and carriers of a competing fuel and their employees. We held merely that parties so affected were authorized to seek review of the substantive issues involved in determining whether or not the public convenience and necessity would be served. We relied upon the Sanders and Scripps-Howard cases[5] and Judge Frank's decision in Associated Industries v. Ickes.[6] Those cases make clear that aggrievement, within the meaning of § 19(b) and other review statutes, is a status conferred by Congress upon a party who, though he may have no interests that must be considered in the administrative determination, is likely to suffer injury by that determination. He may be "the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal."[7] It does not matter whether competitive injury to the barge operators is "in and of itself, and apart from considerations of public con-

2. Id. § 717r(b).

3. 1951, 89 U.S.App.D.C. 135, 191 F.2d 462, 465.

4. 1940, 311 U.S. 295, 61 S.Ct. 254, 85 L. Ed. 198.

5. Federal Communications Comm. v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Scripps-Howard Radio, Inc., v. Federal Communications Comm., 1942, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229.

6. 2 Cir., 1943, 134 F.2d 694.

7. Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. at pages 473, 477, 60 S.Ct. 698.

venience, interest, or necessity, an element the [Commission] must weigh."[8]

■ (2) The argument that the barge operators' injury would result from conversion of Little Inch, rather than from the order, and would therefore not be "direct and immediate injury" within National Coal rests on the notion that the conversion is a matter of free election by Texas Eastern, wholly independent of the Commission's order authorizing abandonment of the natural gas pipeline. The record is clear, however, that Texas Eastern has embarked upon an integrated project of conversion of one pipeline to petroleum products and the substitution of another for transporting natural gas, and that entry into petroleum products transportation is "the basic motivating reason underlying this application" to the Commission.[9] The injury to the barge operators resulting from the conversion flows directly enough from the Commission's order, even though the order does not expressly require conversion.[10]

■ (3) Singer & Sons v. Union Pacific R.R.[11] was a suit by traders in a city market to enjoin a railroad from extending its track to a rival market. Section 402, paragraph 20 of the Transportation Act of 1920 authorizes a "party in interest" *inter alia* to sue to enjoin a railroad from extending its lines without a certificate of convenience and necessity from the Interstate Commerce Commission.[12] The Supreme Court affirmed dismissal of the suit for lack of standing. The case is inapplicable here for the following reasons:

■ (a) The Transportation Act authorizes suits by the Attorney General, the Interstate Commerce Commission, commissions or regulatory bodies of affected states, or "'any party in interest.'"[13] The Natural Gas Act makes no provision for the correction of administrative errors by anyone other than those "aggrieved" parties whose self-interest impels them to activity. Whereas allowing private parties to litigate in a situation like Singer might "invite dislocation of the scheme which Congress has devised for the expert conduct of the litigation",[14] it is the very method chosen by Congress to test the validity of administrative action under the Natural Gas Act.

(b) Mr. Justice Frankfurter[15] points out that, if the railroad had applied for

8. Id., 309 U.S. at page 473, 60 S.Ct. at page 696. National Coal Ass'n v. Federal Power Comm. supra, note 3.

9. The Commission's order allowing withdrawal of Little Inch as a gas pipeline was *in contemplation of the conversion*. It was based, *inter alia*, upon a finding that the abandonment of Little Inch was economically feasible in that, even if its earnings as a products carrier failed to exceed operating expenses, profits would decrease only negligibly. This finding assumes that Little Inch would in fact be operated as a products carrier. The theoretical possibility that Texas Eastern might elect to scrap Little Inch rather than go through with the conversion may, therefore, be left out of our consideration. The effects upon Texas Eastern's financial structure and, consequently, upon its service to consumers of an uneconomic abandonment of 1168 miles of pipeline and 153,350 horsepower of compression facilities, with a rate base value of almost $50,000,000 would have been of major concern to the Commission. No such concern having been expressed, we must presume that the Commission's order rested upon Texas Eastern's commitment to conversion and was made with the aim of authorizing the integrated project of which the conversion would be the central and motivating part.

10. See Greenville Television Co. v. Federal Communications Comm., 1955, 95 U.S. App.D.C. 314, 316, 221 F.2d 870, 872.

11. Supra, note 4.

12. 49 U.S.C.A. § 1(18) and (20) (1929).

13. 311 U.S. at pages 305–306, 61 S.Ct. 259.

14. Id. 311 U.S. at page 307, 61 S.Ct. 260.

15. One opinion was written by Mr. Justice McReynolds, 311 U.S. at page 297, 61 S. Ct. 255, and concurred in by four justices; the other was written by Mr. Justice Frankfurter 311 U.S. at page 305, 61 S.Ct. 258, and concurred in by the same four justices.

a certificate under paragraph 18 of 49 U.S.C.A. § 1 and Singer & Sons had participated in the certification proceeding before the I.C.C., the Singer firm might then have been deemed a party in interest "in the further pursuit of claims before a court after adverse action by the Commission."[16] That was the Sanders case and that is also this case.

■ (c) The injury to the barge operators here may, like that in Sanders, give them "sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission",[17] even if it be not sufficiently direct and immediate to support a suit in the district court.[18]

■ (4) At the administrative hearing, the barge operators made a proffer of proof that (a) they are two of the 25 to 30 barge operators now carrying petroleum products to the market sought by Texas Eastern; (b) the total volume of that market is about 100,000 barrels per day and will so remain for several years; (c) to make Little Inch economically possible as a products carrier, Texas Eastern would have to deliver about 100,000 barrels per day and its income forecasts require volumes far in excess of that figure; (d) Texas Eastern would thus require the entire available market and, because of advantages derived from the relation of its products business to its gas business and the acquisition of Little Inch at a depreciated price, Texas Eastern could succeed in capturing the entire market, including that part of it enjoyed by these petitioners. Exclusion of proffered proof was error.[19] Having precluded the barge operators from proving injury, the Commission cannot now be heard to complain that the record contains no proof.

### Pittsburgh's Standing.

The City of Pittsburgh and its residents are consumers of natural gas delivered through the Little Inch pipeline. It is conceded that Pittsburgh would be aggrieved by a reduction of supply or increase of cost of gas to the consumer. But there is nothing in this record to show that this order would immediately have such consequences and Pittsburgh does not claim that it will.[20] What Pittsburgh claims is that the Kosciusko line

16. Supra, note 14.

17. 309 U.S. at 477, 60 S.Ct. 698.

18. See Associated Industries v. Ickes, 2 Cir., 1943, 134 F.2d 694 and cases there cited.

19. The Commission and Texas Eastern contend that the proffered proof is not properly before us because the proffer was in general rather than specific terms. They call our attention to the following statement by the Hearing Examiner as to the part of the proffer here involved:
"I believe, therefore, the rulings that have been made on that indicate as to Part 2 that proof along those lines would not be deemed by me to be admissible, but I can't make a specific ruling on it such as would be the basis of an appeal because it doesn't lie before me in that form."
"But a specific offer of evidence is not needed where an *entire class of evidence* has been in advance formally declared inadmissible by the trial court during preliminary argument or colloquy; for the Court's ruling relates forward to all possible offers of such evidence and renders them needless." 1 Wigmore, Evidence 318 (3d ed. 1940). To have required the barge operators to make specific offers of detailed evidence with respect to every facet of an issue which had been held to be beyond the scope of the proceeding would have been pointlessly burdensome. The force of this proposition ultimately became clear to the Hearing Examiner and he changed the above-quoted ruling as follows:
"As a result of the repeated study of this material, and considerable difficulty in breaking out what proof would be proposed, I have reached the conclusion that a court of equity would say, first, these are the issues sought to be proved by various and diverse proof, and therefore the court would address itself as to whether the issues are within the scope of the hearing and within the competence of the Commission, and I find that they are not.
"Therefore, Part II is rejected as proposing testimony, to come down to the words of technique, irrelevant and immaterial to any issues present in this case under the law and regulations."

20. Texas Eastern assures the Commission that there would be no immediate in-

can, at relatively little cost, be expanded to carry additional gas when demand increases and that, if this "cheap expandability" of the Kosciusko line were now to be exhausted as a replacement for the abandoned Little Inch, future expansion would require expensive construction of additional facilities, the cost of which would be reflected in increased rates to consumers.

■■■■■■ If these claims are true, Pittsburgh has standing to challenge the order. Though rate increases would occur only in the future, there is nevertheless an immediate injury: the exhaustion of the Kosciusko line's "cheap expandability." It is argued, however, that there has been no *showing* of the likelihood of future expansion of natural gas deliveries or of the effect of such expansion upon consumers. But Pittsburgh's standing must be taken as proven, because proof was forestalled.[21]

■■■■ We disagree with the contention that Pittsburgh, because it did not join the barge operators in making specific objections at the hearing, may not now complain of the exclusion of evidence.[22] Pittsburgh sufficiently adopted the objections taken by the barge operators to give the Commission notice of its contentions and the Commission recognized those contentions and dealt with them on the merits. For Pittsburgh to have add-

ed its specific objections, at every stage of the proceeding, to those made by the barge operators would have protracted and burdened the record; and failure to make such objections prejudiced no one.

■■■■■ Section 19(b) of the Natural Gas Act limits our consideration to those points which have been urged before the Commission in an application for rehearing.[23] The plain purpose of that provision of the statute is to give the Commission an opportunity to rule upon any matter which is to be relied upon on review. The Commission is thus placed in the position of framing the issues we shall hear. By waiving a procedural irregularity and deciding the underlying substantive issue, the Commission places that substantive issue before us for review. Pittsburgh, by its exceptions, raised the question of the effect of the order upon future expansion of gas service. The Commission noted Pittsburgh's exceptions and, rather than dismiss them as unavailing because of failure to object at the hearing,[24] held them insufficient on the merits. Upon entry of the Commission's decision, Pittsburgh duly filed its application for rehearing squarely raising the question of cost of future expansion here relied upon. Under § 19(b) of the Act, that point is properly before us[25] and we

crease of rates to consumers, because the increase in rate base resulting from the new construction would be offset by the reduced cost of operating the new pipeline.

21. Evidence relating to future expansion was excluded by the Hearing Examiner as beyond the scope of the proceeding. The Commission approved such rulings upon the ground "that in this application no additional service is proposed."

Texas Eastern argues that the part of the proffer of proof relating to Pittsburgh's contention was not rejected by the Examiner, but that no evidence was thereafter presented in support of it. The record shows, however, that, after testimony by Texas Eastern witnesses as to their immediate proposals, the Examiner ruled that he was "not going to hear any rebuttal testimony with re-

spect to future expansion. That is not an issue in this case."

22. Rule 1.31(c): "* * * Exceptions covering rulings admitting or excluding evidence not objected to at the time the rulings were made, will be unavailing."

23. Supra, note 2.

24. Commission Rule 1.31(c), supra, note 22.

25. Compare Telanserphone, Inc., v. Federal Communications Comm., 97 U.S. App.D.C. 398, 231 F.2d 732. "The Commission says further, however, that the question [of rates] was not properly reserved for our review. * * * Telanserphone failed to propose for Commission consideration a finding and conclusion to the effect that it should be awarded a preference in rates. But, as we have seen, not only was the subject

shall deal with it in the next section of this opinion.

## The Question of Future Expansion as Affecting the Public Convenience and Necessity.

The Texas Eastern system consists of three principal pipelines: the 24-inch "Big Inch" line, the 20-inch "Little Inch" line, and the 30-inch Kosciusko line, all three feeding into the Appalachian region in the neighborhood of Pittsburgh. The two "Inch" lines originate in Texas, relatively close to the sources of natural gas. The Kosciusko line, originating in central Mississippi and relying for its gas supply upon feeder lines [26] from the gas fields, is the only one of the three lines not operating at capacity. Indeed, it has room for the load of about 200 million cubic feet per day now being carried by the Little Inch line.

The Commission's order approved a proposal to withdraw Little Inch from gas service and transfer its load to the Kosciusko line through the newly constructed Baytown-to-Kosciusko tie-line. The system would then operate at capacity, but would have no facilities available for expansion.

To provide for expansion of service would require looping of either the Big Inch line or the Kosciusko line—*i. e.*, construction of a pipeline parallel to the original line. It is the declared policy of Texas Eastern not to expand either of the Inch lines because of the possibility of recapture by the Government under the provisions of the 1947 agreement.[27] Therefore, expansion of service would necessarily mean looping of the Kosciusko line. If Little Inch is not abandoned, the next block of expansion would simply utilize the excess capacity of the Kosciusko line—through a tie-line, but without looping. With the abandonment of Little Inch, however, the next block of expansion would entail an increase in the rate base to gas consumers based upon the cost of looping the Kosciusko line as well as the cost of the tie-line. The petitioners assert that the consumers are entitled to the benefit of the less expensive expandability.

It may be an answer to this assertion, so far as cost to the consumer is concerned, that saving in operating costs through elimination of the relatively inefficient Little Inch line would outweigh the increase in rate base. Perhaps, also, the Baytown-to-Kosciusko tie-line is necessary for expanded service and will not be economically feasible unless it absorbs the Little Inch load. But the sufficiency of either of these answers or any others that might appear from a study of the circumstances is to be judged not by us in the first instance, but by the Commission. That body persistently closed its eyes even to the existence of the problem of future expansion.

Thus, when Texas Eastern's president testified at the hearing that demand for gas was ever increasing and that, very shortly after approval of the instant proposal, the Company would apply for authority to expand its new facilities and make additional sales, the Hearing Examiner forbade cross-examination on the ground that "we are not here to try an application that has not been made." And the petitioners' proffer of proof that the present pre-emption of the Kosciusko line's relatively inexpensive expandability would make the next block of expansion more expensive, significantly increasing cost of service, was rejected on

---

of rates among the issues framed by the Commission to be heard comparatively, but after the Commission's own decision Telanserphone raised the question again in its petition for rehearing. And it actually was dealt with by the Commission in its Memorandum Opinion and Order denying that petition. Accordingly, we know of no reason whatever why we cannot consider the question."

26. Companies from which Texas Eastern purchases gas deliver it from their own pipelines into the Kosciusko line.

27. The Government reserved a right to repurchase the Inch lines when they were sold in 1947. The repurchase right expires in 1967.

the ground that "future expansion * * * is not an issue in this case." Both of these rulings were upheld by the Commission on the ground that "in this application no additional service is proposed."

 In another instance, Texas Eastern's president testified that the tie-line (which the Commission found would bring the Company advantages of flexibility of gas supply) would not be economically possible without the abandonment of Little Inch. But when he was questioned as to whether a certain volume of expansion might not make the tie-line feasible even without abandonment of Little Inch, the Examiner blocked inquiry, saying: "We are not taking up that hypothesis. It is not in the case." The Commission sustained that ruling on the ground that it had no jurisdiction to consider any alternatives to the specific proposal made by the applicant.[28] In this same connection, while this cause was pending before the Commission on exceptions to the Examiner's initial decision, the petitioners filed a motion to reopen the record to admit three memoranda indicating that a Texas Eastern director who had been "very active in all policy matters from the inception of the ideas regarding the reconversion of the Little Inch line," thought that the tie-line would be feasible and should be built whether or not Little Inch is abandoned. The motion recited that the memoranda had been obtained just the previous month, and three months after the hearing was closed, through discovery proceedings in an action pending in the United States District Court for the Western District of Louisiana. The motion also recited that it had been diligently filed as soon as the documents could be analyzed by counsel. Although these recitals stand uncontradicted in the record, the Commission denied the motion because the documents "could have been brought into the hearing by the intervenors in a timely fashion," a conclusion having no support in the record. The Commission added, presumably because of its view that future expansion was not to be considered, that these memoranda would not affect its conclusions. Under our view of the scope of the Commission's inquiry, the motion should have been granted.[29]

 That Texas Eastern would soon move to expand its gas deliveries was apparent throughout the proceeding.[30] This eventuality could have been disregarded only by virtue of some procedural rule of exclusion the nature and basis of which are not clear. During the pendency of this appeal, Texas Eastern's plans became concrete and, on December 19, 1955, it filed an application with the Commission for authority to expand its capacity by 250 million cubic feet per day and its sales by 228 million cubic feet per day. This additional capacity is proposed to be attained by looping the Kosciusko line for a distance of 530 miles at

---

28. The existence of a more desirable alternative is one of the factors which enters into a determination of whether a particular proposal would serve the public convenience and necessity. That the Commission has no authority to command the alternative does not mean that it cannot reject the proposal.

29. If the motion to adduce the additional evidence were made to us, we would have no hestitation in granting it. The Natural Gas Act provides in § 19(b), supra, note 2: "If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce

such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper."

30. In addition to the evidence of increasing demand for gas, already referred to, note that, after this appeal commenced, Texas Eastern announced that it had made a conditional contract with the Mexican Government calling for delivery to the Company of 100 million cubic feet of gas per day and that it intended to contract for additional gas and then apply to the Commission for authority to expand its system.

a cost of about $60 million.[31] The petitioners seek by motion to advise us of this application and the Commission and Texas Eastern oppose the motion upon the ground, among others, that the events sought to be brought to our attention occurred almost a year after the hearing was closed.[32] They also argue that the new application does not affect this case because (1) it does not request an increase in rates, (2) the Commission has not yet considered it and determined whether or not to grant it, and (3) if petitioners have interests which can be affected, they may try to intervene in the hearings to be held on the new application. We need not decide the admissibility of the new application in the face of the argument that it occurred long after the hearing was closed. The record amply shows Texas Eastern's intention to apply for authority to expand its capacity and its sales and that such expansion would be through looping of the Kosciusko line. All that the new evidence could add would be a precise date, a precise amount of expansion, and a precise looping proposal. Such details, however, are unnecessary for our purposes.[33] If they should be material in further proceedings before the Commission, we have no doubt the Commission has ample authority to consider them.

The Commission's basic argument in opposing consideration of the question of expansion is, first, that the application which gave rise to the order and to this petition contained no provision for expansion; and, second, that any interest of the petitioners which may be affected by a separate application for authority to expand can be urged at the hearing on such application. This argument disregards the gist of petitioners' position: that the present abandonment of Little Inch must inevitably increase the cost of any future expansion. If, as petitioners say, present conversion of Little Inch to petroleum products transportation means that future expansion of Texas Eastern's gas service will be costlier, that factor must be considered now. If, *with Little Inch already abandoned,* the Commission finds that expansion would serve the public convenience and necessity, it will not forbid such expansion merely because it would have been less costly with Little Inch still part of the system.

We said in American Airlines, Inc., v. Civil Aeronautics Board:

"The public convenience and necessity for which regulatory agencies issue certificates are the convenience and necessity of the future. The needs of yesterday require no fulfillment if they be not the needs of tomorrow. They may require recompense, but they need no regulation. Every new bus route, new airplane service, new radio station, new stock issue, new pipe line, new power project, and so on, seeks its permissive certificate upon the basis of future possibilities. * * * So the function of the agencies to which Congress has delegated these responsibilities is to examine the relevant past and present and then to exercise a rational judgment upon that data to ascertain the public convenience and necessity in the reasonably foreseeable future." [34]

So, whether the circumstances arising from future expansion of the Texas Eastern system would argue for or

31. Docket G–9784, Federal Power Commission.

32. While the Commission thought these events a year too new, we note that it ruled that the events which petitioners sought to introduce by their motion of May 20, 1955 (to reopen the hearing to admit three memoranda) were a year too old.

33. Were those details necessary, we should

hold the evidence admissible. In our review of administrative determinations, it would be most unrealistic to disregard crucial events occurring pending appeal. See, e. g., Fleming v. Federal Communications Comm., 96 U.S.App.D.C. 223, 225 F.2d 523 (1955); Enterprise Co. v. Federal Communications Comm., 97 U.S.App.D.C. 374, 231 F.2d 708.

34. 1951, 89 U.S.App.D.C. 365, 368–69, 192 F.2d 417, 420–421.

against the conversion here authorized by the Commission, those circumstances must be considered.[35] Indeed, the Commission, with a seeming lack of assurance in its conclusion that future expansion is not to be considered, said:

"While it is quite apparent that the proposal before us does not involve future expansion, we cannot at any time close our eyes to the potential expansion inherent in any project."

But it did close its eyes to the relative advantages or disadvantages of the conversion in the light of future expansion. It concurs now in Texas Eastern's argument that future expansion is too ephemeral a matter to consider in evaluating the Company's proposal. Reminding us that we said in the American Airlines case that "permissions for the future cannot be fashioned from pure fantasy, speculation devoid of factual premise",[36] the Commission argues that an estimate of the cost of service on a future block of expansion is necessarily too speculative because the cost of the gas to be purchased is an unknown factor. Our present inquiry, however, is into the relative cost of carrying a given quantity of gas from Texas to the Appalachian region on alternative hypotheses: (1) that Little Inch is a part of the system, (2) that Little Inch has been abandoned. From that point of view, the cost of gas to be purchased is a relative constant in the equation and may be disregarded. It is conceded that, whether or not Little Inch remains in the system, expansion will be via the Kosciusko line, since that is the only part of the system having any unused capacity. The inquiry must be, then, into such questions as whether, with Little Inch abandoned, the next block of expansion would require looping of the Kosciusko line, what the approximate cost of such looping would be, and whether and to what extent the cost of such looping would affect the cost to the consumer. This is the sort of inquiry customarily made by regulatory agencies.

The exclusion of evidence relating to future expansion and the refusal to consider future expansion in determining the public convenience and necessity were erroneous.

### The Effect of the Order upon Petroleum Products Carriers.

The barge operators urge, as additional grounds for reversal, that the order would permit Texas Eastern to take over the entire petroleum products market they now serve and drive them out of business. They concede that it is not improper for a natural gas pipeline operator to go into the petroleum products pipeline business and that no authorization from the Commission is necessary for that purpose. They say, however, that Texas Eastern would bring to its new business a destructive competitive power born of the financial advantages it derives from its natural gas business and that this destructive power is inherent in the order which permits transfer of the Little Inch line to products transportation.[37]

35. We are not persuaded by the argument of Texas Eastern, concurred in by the Commission, that, by using the disjunctive in § 7(b) and (e) of the Natural Gas Act, Congress requires consideration of *either* present *or* future public convenience and necessity, but *not both*. We are bound to construe statutes in a manner which avoids absurdity.

36. 89 U.S.App.D.C. at 369, 192 F.2d at page 421.

37. The rejected proffer of proof was that, by withdrawing the Little Inch pipeline from natural gas and using it to enter the petroleum products business, Texas Eastern would be able (a) to finance a products pipeline venture which could not otherwise be financed; (b) to endure losses from products pipeline operations by absorbing them into gas pipeline revenues which would increase by virtue of the order of the Commission; (c) to use its reserves and revenues derived from its gas business to broaden its products business more than it otherwise could; and (d) to enjoy artificially low costs of operation of its products business by transferring Little Inch at a highly depreciated figure.

The publicly significant consequences of such destruction of the barge operators' business are claimed to be not only violation of the national policy against monopoly expressed in the antitrust laws, but also imperilment of the national defense.[38]

Whether the conversion of Little Inch, which is made possible by the Commission, would have the destructive effects foreseen by the petitioners and whether, if so, the project is contrary to the public convenience and necessity are questions not raised on this petition. The narrow issue before us is merely whether those questions are within the ambit of the Commission's power to determine. Both the Hearing Examiner and the Commission held that they were not. To us it is clear that they are.

■■■■ The Commission, while it "has no power to enforce the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note] as such * * * [and] cannot decide definitely whether the transaction contemplated constitutes * * * an attempt to monopolize which is forbidden by that Act * * *," nevertheless "cannot without more ignore the [Act]." [39] Thus, if it appears that Texas Eastern's project would tend to produce monopolization of a petroleum products market, the Commission cannot ignore that fact merely because it is an antitrust factor and such factors have been placed within the ken of the Attorney General. That he is specially competent as to the antitrust laws does not make all other officers or agencies of the Government incompetent.

Even private citizens play a role in the effectuation of our national antitrust policy. It would seem odd if circumstances upon which private citizens may found legal and equitable remedies and defenses should be wholly beyond the reliance of the Government. Although the Commission has no power to enjoin conduct as illegal under the Sherman Act or even to declare such illegality, it certainly has the right to consider a congressional expression of fundamental national policy as bearing upon the question whether a particular certificate is required by the public convenience and necessity.

■■■■ So far as problems of national defense are concerned, other agencies are more directly responsible and more competent than this Commission. The Commission would, of course, do well to respect the views of such other agencies as to those problems. As we said in the National Coal case:

"It is enough to say that the Commission properly assessed great weight to the Atomic Energy Commission's view that the safety and well-being of the nation required use of natural gas as a fuel at its Oak Ridge plant, and that the proposed pipeline would adequately provide the gas needed for the manufacture of fissionable materials." [40]

The views of defense agencies can have no influence at all over the determinations which come within the Commission's jurisdiction, if the Commission

---

38. Petitioners argue that, although a wartime emergency might require the conversion of Little Inch to petroleum products transporation to supplement the capacity of the barges, peace-time conversion of Little Inch would displace the barges, thereby reducing the total facilities available for carrying products in an emergency. They also argue that the vitally important industrial region now served by the barge operators would be in much graver peril of losing its products supply in war time if it depended upon Little Inch rather than upon the barges, because bombardment of the Gulf Coast refineries to which Little Inch would be linked would render the pipeline completely useless, while barges, being mobile, can tap alternative sources of supply.

39. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 79–80, 64 S.Ct. 370, 377, 88 L.Ed. 544; see also National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 223, 224, 63 S.Ct. 997, 87 L.Ed. 1344.

40. 89 U.S.App.D.C. at page 140, 191 F. 2d at page 467.

treats defense problems as beyond the limits of its notice.

 Texas Eastern asserts that, since the Interstate Commerce Commission would have jurisdiction over Little Inch as a products carrier, the questions which have been raised as to the effects of conversion upon the barge operators should be left to be dealt with by that agency. Although the I.C.C. has the power to regulate the rate schedules of products pipelines,[41] it does not have over them such certification jurisdiction as the Federal Power Commission has over natural gas pipelines. To the extent, therefore, that the evils anticipated by the petitioners are automatic incidents of the conversion project and not dependent upon any particular rate schedule, they can be prevented only by administrative supervision at the very genesis of the project. Such supervision is beyond the jurisdiction of the I. C. C. and can be supplied only by the Federal Power Commission.

### Miscellaneous Points.

At the hearing considerable friction developed between the Hearing Examiner and counsel for the barge operators. The barge operators urge here, as they did before the Commission, that the Hearing Examiner was so hostile and biased against them as to entitle them to a new hearing. The Commission overruled this contention. We cannot say that the Commission erred.

 A final matter requiring mention relates to the War Assets Administration's sale of Little Inch to Texas Eastern in 1947. The agreement of sale provided that the vendee could use

the line for either petroleum products or gas transportation. It recited also that the vendor had reported the facts and circumstances of the sale to the Attorney General and had been advised "of his approval of this proposed disposition." From this agreement, the Commission has determined that Texas Eastern has a "contract right" to convert Little Inch and that such conversion "has already been approved by the United States Government and the Attorney General." We think those determinations were erroneous.

The agreement, in our view, merely means that there is no contractual restriction against conversion. The Attorney General's approval of the agreement cannot signify his acquiescence in a future disposition of the line which may involve violations of the policies of the antitrust laws. Nor, of course, would such acquiescence by the Attorney General amount in law to a waiver of any public right inherent in the Natural Gas Act. The Attorney General's view, though not dispositive, would, of course, be material and persuasive evidence before the Commission on all issues within his special competence. In that connection, the Commission should consider not only the recital of the 1947 agreement, but also the explanatory letter of February 25, 1947, from the Department of Justice to the War Assets Administration, [42] which was brought to our attention by the petitioners' application of September 7, 1955, for leave to adduce additional evidence.

For all of the foregoing reasons, the Commission's order must be set aside and the case remanded to the Commis-

---

41. 49 U.S.C.A. § 1(1) (b).

42. The Attorney General's letter stated that "it does not appear that consummation of the proposed sale, as such, would be a violation of the antitrust laws." But the letter went on to say: "Likewise, our examination of this matter has not extended to the considerations which are within the jurisdiction of the Federal Power Commission or any other regulatory body and we, of course, have not reviewed this matter except

for the purposes of Section 20 of the Surplus Property Act [50 U.S.C.A.Appendix, § 1629]. We feel we should also point out that *we are not expressing any views as to the legality under the antitrust laws of any present or future disposition or utilization of facilities included in these plancors and not needed for the operations of the purchaser as set forth in their bid.*" (Emphasis supplied.)

sion with directions to reopen the record for the purpose of conducting further proceedings consistent with this opinion.

So ordered.