**PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Michigan Consolidated Gas Company; County of Wayne, Michigan; Michigan Public Service Commission; Intervenors.

Nos. 16583, 16584.

United States Court of Appeals District of Columbia Circuit.

Argued April 12, 1962.

Decided June 30, 1962.

Mr. Robert L. Stern, Chicago, Ill., with whom Messrs. Harry S. Littman and Raymond N. Shibley, Washington,

D. C., were on the brief, for petitioner. Mr. Dale A. Wright, Washington, D. C., also entered an appearance for petitioner.

Mr. Peter H. Schiff, Atty., Federal Power Commission, with whom Messrs. Ralph S. Spritzer, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, and Abraham R. Spalter, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent. Mr. John C. Mason, Gen. Counsel, Federal Power Commission at the time the record was filed, also entered an appearance for respondent.

Mr. David R. Kaplan, Detroit, Mich., of the bar of the Supreme Court of Michigan, *pro hac vice*, by special leave of court, with whom Mr. J. Parker Connor, Washington, D. C., was on the brief, for intervenor County of Wayne, Michigan.

Mr. William R. Connole, Washington, D. C., of the bar of the Supreme Court of Connecticut, *pro hac vice*, by special leave of court, for intervenor Michigan Public Service Commission. Mr. Jerome Maslowski, Lansing, Mich., was on the brief for intervenor Michigan Public Service Commission.

Mr. Charles V. Shannon, Washington, D. C., entered an appearance for intervenor Michigan Consolidated Gas Co.

Before BAZELON, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

Petitioner Panhandle Eastern Pipe Line Company seeks to review two orders of the Federal Power Commission disallowing rate increases filed by it, and requiring it, for the periods in question, to file newly computed lower rate schedules—on the basis of which refunds to customers are to be made. The total amount of the increases, collected subject to refund, is over $40,000,000.

The earlier of the two rate proceedings before the Commission, which dealt with the period from February 20, 1952, to December 31, 1954, was the subject of this court's decision in City of Detroit, Michigan v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810 (1955), cert. denied, 352 U.S. 829, 77 S. Ct. 34, 37, 1 L.Ed.2d 48 (1956). In that case the Commission had approved rate increases sought by Panhandle, and had allowed Panhandle to include in its cost of service the so-called "field price," or "commodity value," for its own produced gas, rather than a rate for such gas computed under the conventional utility cost rate base method.[1] The Commission also had ruled that Panhandle's profita-

---

1. In the City of Detroit case, 97 U.S.App. D.C. at 263, 230 F.2d at 813, we said:

   "The rate base is a figure representing the money prudently invested in the properties and equipment utilized in the company's transmission and production business. The percentage of profit prescribed by the Commission depends upon a variety of factors, such as the risks of the business, the necessity for attracting capital, and the desirability of lower cost of gas to the public. In order to return a profit on the rate base the rates are set high enough to recover all costs of service, including taxes, depreciation, depletion, and all operating expenses chargeable to production and transmission."

   In the same case, we went on to describe the "field price" method, as follows:

   "[For Panhandle's own producing properties, the Commission] computed a 'field price' for the gas obtained from this source, based upon the 'weighted average

arm's length prices' established by federally unregulated bargaining for similar gas in the fields. It then multiplied the volume of Panhandle's production by that 'field price' and included the result in Panhandle's operating expenses as an amount to be recovered through the rates. At the same time the Commission excluded from the rate base the cost of the properties which produce this gas and excluded from recoverable operating expenses the cost of producing it. The Commission states that its purpose is to allow Panhandle to receive for its own produced gas 'a price reflecting the weighted average arm's-length payments for identical natural gas in the fields (and sometimes from the very same wells), where it is produced,' instead of a return on its legitimate investment in the properties and equipment used in producing this gas." Ibid.

ble hydrocarbon extraction operations [2] at Sneed, Texas, and Liberal, Kansas, constituted a separate business, so that neither the costs nor the revenues of the extraction operations should be reflected in rates fixed for petitioner's regulated activities. We held that the record and findings did not support these rulings. While not denying the Commission's power to deviate from the traditional rate-base method, we pointed out that "it is essential in such a case as this" to use the rate base approach "at least as a point of departure." Supra at 268, 230 F.2d at 818. We also deemed insufficient the Commission's justification for refusing to credit Panhandle's hydrocarbon extraction revenues. Accordingly, we set aside the Commission's order and remanded it for further proceedings not inconsistent with our opinion. As to the field price issue, we permitted the Commission, "if it so desires, to seek to supplement the record and findings." Supra at 269, 230 F.2d at 819. On April 27, 1961, the Commission issued an opinion and order (269–A, G–1116) modifying its former opinion (269) to accord with our decision in the City of Detroit case. This is the first of the two orders that Panhandle here seeks to have reviewed.

Prior to this court's decision and remand in the City of Detroit case, Panhandle had also filed an application for increased rates to become effective August 1, 1954. These rates were suspended by the Commission in its order issued December 13, 1954, which permitted Panhandle to file substitute rates at a lower level, effective January 1, 1955. This interim order was affirmed by the Third Circuit. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 236 F.2d 606 (1956). Panhandle's lower substituted rates were permitted to be col-

lected under bond from January 1, 1955, through August 31, 1958. Hearings were held at various times from October 1955 to January 1957. On February 10, 1959, the Examiner rendered a decision holding, *inter alia,* that Panhandle had failed to justify an allowance greater than that computed by traditional rate base methods, and denying the rate increase which had been collected under bond. On January 14, 1960, the Commission reopened the proceedings to take additional evidence on the commodity value issue. The reopened hearings were concluded on March 11, 1960, and the Commission issued its opinion and order (Opinion 344) on April 27, 1961. This is the second of the two Commission orders here under review and contains the most lengthy exposition of the reasoning relied on in both decisions of the Commission. (269–A and 344).

Panhandle vigorously defends the rate increases it sought. It contends that in order to encourage exploration and development, and to maintain its production of gas, it should have been granted an additional allowance for this purpose above that accorded by the Commission.[3] Panhandle has two principal arguments.

First, Panhandle says the Commission erred when it found that Panhandle had not justified a claimed commodity value (weighted average field price) allowance for company produced gas, and when it denied permission to charge a rate above that computed under the cost rate base formula. Panhandle is, however, under the Commission's rulings, receiving for exploration and development an allowance covering out-of-pocket operating expenses, unproductive exploration and development expenses, and depreciation and depletion, plus a 6 per cent rate of return on its production properties.[4] Panhan-

2. In these operations, gasoline and other hydrocarbon products are removed from the natural gas stream. To some extent, such extraction can improve the efficiency of the pipeline by reducing the liquid content of the gas.

3. It should be noted that this controversy presents a somewhat distinctive problem,

in the sense that Panhandle has dual objectives—it seeks a "just and reasonable" rate and return for transporting gas for others, while at the same time, it is desirous of maintaining its own fields as a source of gas supply.

4. Panhandle contends that there is no evidence to support the Commission's finding

dle claims that these allowances are insufficient for a wasting asset industry in which costs are rising, because they do not provide the funds needed for replacing either the gas or the gas pressure consumed. Panhandle argues that the current cost of finding and replenishing its gas reserves is much more than the original cost of the gas withdrawn, so that depreciation and depletion based on original costs will not be sufficient to cover the cost of replacement. An allowance based on field price would, says Panhandle, provide a fair and proper measure of return, and an incentive to exploration and development.

Second—on a basis closely related to the first argument—Panhandle contends that it should be allowed certain development costs which it says it was entitled to incur, even though it never actually did incur them.[5] Panhandle says that it could reasonably have spent some $20,000,000 on an expanded program of exploration and development during the period in question, beyond what it did in fact spend. This amount, when added to the amount allowed by the Commission for company-produced gas, would closely approximate an allowance based on the weighted average field price. Pan-

handle insists that the field-price method of computing its costs—or the equivalent method of computation based on the expense of an expanded program of exploration and development—will maintain its ability to deliver gas, and thus will benefit the consuming public.

Forceful as Panhandle's contentions are, we are not persuaded that the Commission has erred. We think that the Commission was not obliged on the record made to grant a larger allowance than it did, and that it left the door open for a more liberal treatment in future years on a more persuasive record. Certainly it was entitled to reject the claim based on hypothetical development costs not actually incurred. Especially is this so in light of Panhandle's failure in fact to carry out a full exploration program, the availability of other methods of financing development, and the difficulty of insuring that the funds from a rate increase attributable to granting the requested development allowance would actually go into exploration and development.

The issues raised here involve a delicate balancing by the Commission of the interests of the company, its shareholders, the consumer, and the public. After

---

that Panhandle should be allowed only a 6 per cent rate of return on its production properties. In this regard, petitioner's major argument is that the Commission was not entitled to use the data and conclusions relevant to the proper return for Panhandle's pipeline properties as evidence and a reference point for determining a proper return on its production operation. The Commission determined that Panhandle, as a practical matter, is an integrated producing and pipeline business financed as a unit, and that therefore the data used to calculate the rate of return for Panhandle's pipeline operation was applicable to its production properties. The Commission's decision also rests on its own analysis of petioner's capital structure, in which it finds that to allow a 6 per cent return on Panhandle's production properties will make 12 per cent available to the owners of the common stock on the portion of equity attributable to production assets (R. 8416), cf. Phillips Petroleum Co., 24

F.P.C. 537 at 573–74 (1960), aff'd sub nom. State of Wisconsin v. Federal Power Commission, 112 U.S.App.D.C. 369, 303 F.2d 380 (1961), cert. granted, 369 U.S. 870, 82 S.Ct. 1139, 8 L.Ed.2d 275 (1962), where the same allowance was given on equity. We do not think that the Commission acted unreasonably in utilizing the evidence that it did use or in its analysis of petitioner's capital structure.

5. In its brief, Panhandle says:
"The Commission's position means that petitioner is not entitled to any additional allowance for the amount needed, as the Commission assumed it was, for exploration and development, because it did not actually spend that amount during a period when its right to receive and retain the revenue needed to support such expenditure was not recognized. But petitioner could not be expected to expend the larger amount for exploration and development before it knew that this would be reflected in its revenues."

careful consideration, we are unable to say that the method of computation selected by the Commission was unjust, unreasonable, or not conducive to proper exploration and development. Cf. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).[6]

■ Alternatively, Panhandle asks that it be allowed to include in its cost of service the amount of tax savings derived from the gas and oil depletion and intangible well-drilling costs provisions of Sections 613 and 263(c) of the Internal Revenue Code of 1954, 26 U.S. C.A. §§ 613, 263(c), thus translating the tax savings into additional company profits. The Commission, however, elected to treat Panhandle's rate of return as a separate question from that of tax allowances, and in effect passed on to the consumer the tax savings. In so doing, we think that the Commission acted consistently with both congressional intent and prior judicial decisions. As the Fifth Circuit said in El Paso Natural Gas Co. v. Federal Power Commission, 281 F.2d 567, 573 (5th Cir. 1960), cert. denied sub nom. California v. Federal Power Commission, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961):

> "We think, in short, that there is no statutory authority for the Commission to treat actual savings in taxes to which natural gas companies are entitled any differently than savings in any other cost of service. It is the obligation of all regulated public utilities to operate with all reasonable economies. This applies to tax savings as well as economies of management. The net result of this, of course, is that such savings

as are effected are passed on to the consuming public. This we consider to be the natural and necessary consequence of rate regulation."

See also Cities of Lexington, etc. Ky. v. Federal Power Commission, 295 F.2d 109 (4th Cir. 1961).

■ Finally, Panhandle argues that the Commission should not have credited *all* of the revenues from the Liberal and Sneed hydrocarbon and gas extraction plans to the pipeline cost of service, and that only that proportion of the extraction business which improves the pipeline's efficiency should be credited to the pipeline business. Put another way, Panhandle seems to claim (1) that extraction operations which improve pipeline efficiency must be treated as within the Commission's jurisdiction, while those that do not should be treated as non-jurisdictional, and (2) that when jurisdictional and non-jurisdictional operations use the same facilities, the operating cost of these facilities should be allocated between them. We have found no real authority for these propositions advanced by Panhandle. On the contrary, the treatment of the extraction revenues here utilized by the Commission has been followed in numerous cases. See, e. g., In the Matter of City of Cleveland v. Hope Natural Gas Co., 3 F.P.C. 150, 178 (1942); In the Matter of Cities Service Gas Co., 3 F.P.C. 459, 480–81 (1943). The Commission's action in both of these cases has received judicial sanction. See Hope Natural Gas Co. v. Federal Power Commission, 134 F.2d 287, 307–08 (4th Cir. 1943), reversed on other grounds, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Cities Service Gas Co. v. Federal Power Commission, 155 F.2d 694,

---

6. Panhandle urges that the Commission has misread the City of Detroit opinion. It points to the Commission's statement that the allowance being made for Panhandle's own produced gas is "nowhere near what appears to be required to encourage a vigorous and continuing program of exploration and development, but the record does not support more." (R. 8406) The Commission, we think, was not by this statement indicating any mis-

understanding of the Detroit opinion, or admitting that it had treated Panhandle unfairly. It was clear that Panhandle would not commit itself to undertake an expanded program of future exploration and development unless the field price or its equivalent was allowed by the Commission for the gas produced during the refund period. It was clear also that such a program had not been carried out in that period.

768

703 (10th Cir.), cert. denied, 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664 (1946). In sum, crediting revenues such as those in issue to the operating expenses of the pipeline business is the "normal" and judicially approved method employed by the Commission. In the City of Detroit case, the Commission departed from this practice because it feared to base rates "in part upon the fluctuating and unregulated prices of natural gasoline and other liquid hydrocarbons." See 97 U.S.App.D.C. at 269, 230 F.2d at 819. On appeal, we stated that this was an unacceptable reason. Since the Commission had not demonstrated a basis for its conclusion that the extraction business should be treated as non-jurisdictional, we said that "credit for these revenues should be given." 97 U.S.App.D.C. at 271, 230 F.2d at 821.[7] There is little doubt that the City of Detroit decision would, under certain circumstances, permit the Commission to allocate costs among a company's pipeline and extraction operations. But the Commis-

sion is hardly compelled to make such an allocation. We construe the City of Detroit case as not foreclosing the question of allocation as a matter within the Commission's reasonable discretion. However, there is a serious doubt in this case as to whether the Commission so understood the City of Detroit decision. Indeed, there are strong indications that the Commission believed that City of Detroit requires, where extraction operations in some way improve the efficiency of a transmission system, that the entire extraction revenues be credited to the pipeline.[8]

For this reason, we will remand to the Commission to reach an independent determination, in light of our opinion in the City of Detroit case, as to whether there should be an allocation of the extraction plant profits at Sneed and Liberal. We find no error with regard to the remaining contentions advanced by petitioner.

So ordered.

[7.] See, also, 97 U.S.App.D.C. at 270, 230 F.2d at 820, where we pointed out: "These facts regarding the usefulness of the extraction process to the transmission operations, the joint use of facilities, and the joint incurring of expenses, coupled with the obvious fact that the extraction process is incident to the over-all pipeline transmission and resale operations, clearly bring the extraction operations within the jurisdiction of the Commission."

[8.] The Commission explicitly stated:
"We agree with the presiding examiner

that the evidence presented by Panhandle is not sufficient to overcome the *court's holding that where the extraction of hydrocarbons improves the efficiency of and is incidental to the operation of Panhandle's transmission system, the revenues derived from such extractions should be credited to its cost of service.* Panhandle's additional evidence confirms our earlier finding that the extraction operations do improve the efficiency of the pipeline and therefore clearly come within *the rule laid down by the court.*" (R. 8410) (Emphasis added.)