**MID–AMERICA PIPELINE COMPANY,**
**Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
**Respondent,**
**Northern Natural Gas Co., Intervenor.**

**No. 17717.**

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 7, 1963.

Decided Feb. 20, 1964.

Petition for Rehearing Denied
April 15, 1964.

Mr. William W. Ross, Washington, D. C., with whom Mr. J. David Mann, Jr., Washington, D. C., was on the brief, for petitioner.

Mr. Israel Convisser, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, Gen. Counsel, and Robert L. Russell, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent. Mr. Howard E. Wahrenbrock, Sol., Federal Power Commission, also entered an appearance for respondent.

Mr. Charles A. Case, Jr., Washington, D. C., with whom Messrs. Justin R. Wolf, Washington, D. C., and F. Vinson Roach, Omaha, Neb., were on the brief, for intervenor.

Before BAZELON, Chief Judge, and DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Petitioner, Mid-America Pipeline Company, seeks review of an order of the Federal Power Commission under Section 7 of the Natural Gas Act [1] granting a certificate of public convenience and necessity to Northern Natural Gas Company, Intervenor, to construct and oper-ate facilities for natural gas transmission. This order also disclaimed certificate jurisdiction over an extraction plant constructed by Northern Gas Products Company (Products Company) adjacent to the certificated pipeline of Northern. The challenged order was issued December 28, 1962; Mid-America sought rehearing January 14, 1963, and rehearing was denied March 12, 1963.

Mid-America is exclusively an interstate common carrier of natural gas liquids with a liquids pipeline system extending from New Mexico and West Texas to Minnesota and intermediate points. It is subject to regulation only by the Interstate Commerce Commission.[2] Northern is a major natural gas company which owns and operates an interstate natural gas pipeline system; it also owns Products Company a subsidiary engaged in the extraction, transportation and sale of liquefied petroleum. The transmission facilities certificated by the challenged order were to supply approximately 900,000 Mcf on gas per day to Products Company's extraction plant for the extraction of liquid petroleum gases from the gas stream and thereafter return the residue natural gas to Northern's main transmission line. In this process the natural gas so diverted and later returned to Northern's line would be depleted by an estimated 39,862 Mcf on a peak day and would suffer a specified heating loss. See footnote 6, infra.

Mid-America attacks primarily the Commission's disclaimer of certificate jurisdiction over the extraction plant, arguing that this facility is used as a conduit for transmission of natural gas in interstate commerce and that the extraction operations will significantly impair the heating content of the gas stream. Mid-America points out that Products Company also proposed to construct and operate a natural gas liquids pipeline

1. 52 Stat. 824 (1938), as amended 56 Stat. 83 (1942), as amended 15 U.S.C. § 717f (1958).

2. Interstate Commerce Act, § 1, 41 Stat. 474 (1920), as amended 49 U.S.C. § 1 (1958); Interstate Commerce Act, § 6, 34 Stat. 586 (1906), as amended 36 Stat. 548 (1910), as amended 49 U.S.C. § 6 (1958).

running from Kansas to Iowa, where it would connect with another pipeline, and that Products Company's projected terminals for the sale of liquids along its pipelines would place facilities within Mid-America's marketing area. The combined activities of Northern and Products Company, it is argued, would thus compete directly with Mid-America's service both in supply and market areas. Before the Commission, Mid-America contended that it could supply the needs of the area indefinitely and that extraction operations would ultimately increase Northern's transportation costs by preempting low-priced gas reserves and diminishing cheap expansibility. Mid-America urges that Northern would thus be enabled improperly to subsidize its liquid gas business by loading part of the extraction operating costs onto its jurisdictional natural gas customers, thereby engaging in unlawfully subsidized competition with Mid-America.

■ The Commission maintains that Mid-America has no standing because the claim of potential competitive injury is too speculative to meet the test of aggrievement under Natural Gas Act, § 19(b), 52 Stat. 831 (1938), as amended 15 U.S.C. § 717r(b) (1958). Mid-America will be adversely affected by operation of Products Company's transmission facilities to the extent that Mid-America's shippers will be unable to compete with Products Company in the sale of liquid gas. The Commission found that "Mid-America's evidence tended to prove that Products Company's operation will compete vigorously with Mid-America." This affords a basis for concluding that Mid-America has standing to challenge the order under review. Cf. City of Pittsburgh v. Federal Power Commission, 99 U.S.App.D.C. 113, 118–120, 237 F.2d 741, 746–748 (1956).

Mid-America contends that the holdings in City of Detroit v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810 (1955), cert. denied sub nom. Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956); and Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 113 U.S.App.D.C. 94, 305 F.2d 763 (1962), cert. denied, 372 U.S. 916, 83 S.Ct. 719, 9 L.Ed.2d 722 (1963), are dispositive in that they require Northern to obtain from the Commission a certificate of public convenience and necessity for construction and operation of the extraction plant. However, these cases arose out of rate-making rather than certification proceedings. In the *City of Detroit* opinion we noted that "the obvious fact that the extraction process is incident to the overall pipeline transmission and resale operations, [coupled with other factors mentioned] clearly brings the extraction operations within the jurisdiction of the Commission." 97 U.S. App.D.C. at 270, 230 F.2d at 820. We ordered the Commission to re-examine its decision that it would not credit extraction plant revenues to natural gas pipeline operations in setting natural gas rates; subsequently, in *Panhandle, supra,* we concluded that the Commission had erred in construing our opinion in *City of Detroit* as requiring that *all* extraction revenues be credited to the pipeline and we again remanded to the Commission with directions "to reach an independent determination, in light of our opinion in the City of Detroit case, as to whether there should be an allocation of the extraction plant profits * * *." 113 U.S.App.D.C. at 99, 305 F.2d at 768.[3] Thus, these cases did not involve a question of certificate jurisdiction; rather they dealt with the circumstances in which the Commission could consider cost allocation between pipeline operations and non-certificated facilities.

■ In the order under review, the Commission explicitly conditioned issuance of a certificate of public convenience and necessity to Northern for the additional pipeline upon compliance with the terms of a rate settlement between Northern and the utility customers who had intervened in the Commission proceed-

3. The *Panhandle* case was decided on petition for review of the Commission's decision following remand in the *City of Detroit case.*

ings. In light of this condition, we conclude that the Commission was not required in this case to certificate the extraction operation and that the Commission adequately considered the relevant factors in granting Northern a certificate of public convenience and necessity for the additional transmission facilities.

Significantly the Commission stated: "[W]e need not finally determine the matter of cost allocations in this proceeding under Section 7 of the Act. This issue is more properly before us in Sections 4 and 5 proceedings." This finding by the Commission accords with our holdings in the *City of Detroit* and *Panhandle* cases that under appropriate conditions the Commission may treat a non-certificated facility as jurisdictional for purposes of fixing rates for a certificated natural gas facility.[4]

The Commission has expressed assurance, which is supported by the record, that it can provide continued protection to the public interest in future rate proceedings. We rely upon the following conclusions reached by the Commission:

"We therefore conclude that the Settlement Agreement adequately protects Northern's jurisdictional customers from any costs attributable to Products Company, pending allocation to be made in any future rate case involving Northern. * *

"It is neither necessary nor desirable at this time to determine with finality what particular method or principles of cost allocation shall be applied in apportioning costs between the utility customers and the Products Company sale. * * * This is a certificate case, not a rate case, and it is unnecessary to determine with precision allocation principles, methods and resulting costs. As concluded above, Northern's customers will occupy at least as good a position after Products Company commences operations as before. This is as far as we should or need to go here.

"* * * In any future rate proceeding, however, this opinion shall not be deemed to proscribe an examination of *any* cost allocation method relating to assignment of costs to Northern's service to Products Company, or to preclude our adopting a cost allocation method that results in *different* costs being assigned thereto." (Emphasis added.)

In addition, we note that the Commission has provided for a 5.5 cent reduction in rates to Northern's customers to compensate presently for a loss of cheap expansibility [5] and in denying Mid-America's Application for Rehearing has emphasized that questions of compensation for loss of cheap expansibility and preemption of low-priced reserves may also be highly relevant at future rate proceedings:

In this regard we note that because the amount and cost of future expansion of Northern's pipeline capacity is totally unknown at this time,

4. In City of Detroit v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810 (1955), we held that in fixing natural gas rates the Commission had jurisdiction to consider the operations of a non-certificated facility whose operations *enhanced* the properties of the natural gas, when there was "joint use of facilities, and the joint incurring of expenses, coupled with the obvious fact that the extraction process is incident to the over-all pipeline transmission and resale operations," 97 U.S.App.D.C. at 270, 230 F.2d at 820. This holding permits the Commission in rate making to consider the operation of a facility whose operations *impair* the properties of the natural gas (by lowering the B.T.U.) when the other factors listed in the *City of Detroit* case are present. See Panhandle Eastern Pipeline Co. v. Federal Power Commission, 113 U.S.App.D.C. 94, 98, 305 F.2d 763, 767 (1962), cert. denied, 372 U.S. 916, 83 S.Ct. 719, 9 L.Ed.2d 722 (1963).

5. Compare City of Pittsburgh v. Federal Power Commission, 99 U.S.App.D.C. 113, 122–126, 237 F.2d 741, 750–753 (1956).

we do not attempt to allocate conclusively a cost thereof to the extraction operation. Rather, we find that this substantial reduction in rates [provided by the Settlement Agreement] is a satisfactory interim compensation for any loss of cheap expandibility until such loss can be more accurately measured. \* \* \*

\* \* \* This a certificate case, not a rate case, and there is no attempt here to charge jurisdictional customers with the cost of higher priced gas. The Commission will of course determine the extent to which Northern's cost of gas should be allocated to extraction plant operations *in any future rate proceeding involving Northern.* (Emphasis added.)

It seems clear, therefore, that the Commission is satisfied that its processes are available to protect the public interest without the necessity of hearings, at this stage, for certification of the extraction plant of Northern's subsidiary. We are prepared to accept the Commission's view of the matter; [6] were such future protection not available, a different problem would be presented and different results might be indicated in this case.

■ We conclude that the record contains substantial evidence to warrant the Commission's grant of a certificate of public convenience and necessity and that the certificate as conditioned affords adequate interim protection for Northern's natural gas customers against bearing an undue proportion of pipeline operation costs.[7]

6. It is significant that the Commission, pursuant to Natural Gas Act, § 7(e), 56 Stat. 83 (1942), 15 U.S.C. § 717f(e) (1958), has attached certain conditions to the certificate which we assume were intended for the protection of the public interest. Initially the Commission notes that its grant of a certificate conforms to that requested in Northern's application which recited certain pertinent provisions of the contract between Northern and Products Company, and indeed included in Appendix the entire agreement. We view as a distinct limitation on the certificate the terms of this contract providing, as paraphrased in Northern's application, that "Products Company \* \* \* will not cause in any billing month the arithmetic average of the hourly gross heating value of the natural gas in any of [Northern's] main transmission lines downstream of [Northern's Bushton Compresser Station [from where the gas redelivered to Northern by Products Company will re-enter the gas stream] to be less than 975 B.T.U. per cubic foot; and, that at no time during any billing month will the gross heating value in any of the main transmission lines vary more than two (2) B.T.U. per cubic foot below 975 B.T.U. per cubic foot." We thus assume that should the extraction operation cause a depletion in the heating value of the gas stream below either of the levels stated above, the Commission would be obliged to decide whether the public interest required it to institute proceedings under Natural Gas Act, § 14, 52 Stat. 828 (1938), 15 U.S.C. § 717m (1958), in order to determine whether its order had been violated and perhaps to invoke the provisions of Natural Gas Act, § 20, 52 Stat. 832 (1938), 15 U.S.C. § 717s (1958), in order to obtain an injunction in the proper district court against such alleged violation. In this connection, we observe that the Commission has incorporated into its order the conditions set forth in Section 157.20(e) of the Federal Power Commission Regulations under the Natural Gas Act, 18 C.F.R. § 157.20 (1961), which states:

"The certificate issued to applicant \* \* \* shall be effective only so long as applicant continues the operations authorized by the order issuing such certificate and in accordance with the provisions of the Natural Gas Act, as well as applicable rules, regulations, and orders of the Commission."

See also Natural Gas Act, § 7(a), 52 Stat. 824 (1938), 15 U.S.C. § 717f(a) (1958).

7. We need not deal separately with Mid-America's claim of "unlawfully subsidized competition," since the competition could be regarded as unlawfully subsidized only when and if Northern improperly passes some of the extraction costs on to its jurisdictional ratepayers; our disposition of the case, as we have indicated, rests on the Commission's power to deal with this problem in future rate-making proceedings.

We have considered other contentions advanced by petitioner and find they present no basis for disturbing the order under review.

The order of the Commission is affirmed.